IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

AMY N. L. DULANEY                                                    PLAINTIFF

    v.                          CIVIL NO. 18-5203

ANDREW M. SAUL,[1] Commissioner
Social Security Administration                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Amy N. Dulaney, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.    **Procedural Background**:

Plaintiff protectively filed her current application for DIB on September 4, 2015, alleging an inability to work since September 14, 2010, due to degenerative disc disease of the back; osteoarthritis in the spine and hips; chronic edema in the feet, ankles, calves and knees; plantar fasciitis, both feet; Morton's Neuroma, both feet; deterioration of cartilage in both

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

knees after failed surgeries; poor circulation in the hands and feet; and depression.  (Tr. 98, 198).  For DIB purposes, Plaintiff maintained insured status through December 31, 2015.  (Tr. 11, 200).  An administrative hearing was held on November 22, 2016, at which Plaintiff appeared with counsel and testified. (Tr. 56-96).

By written decision dated January 21, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 13).  Specifically, the ALJ found that through the date last insured Plaintiff had the following severe impairments: degenerative disc disease/degenerative changes of the lumbar spine with chronic low back pain; degenerative changes of the bilateral knees and bilateral patellar chondromalacia status post-bilateral knee surgeries; bilateral plantar fasciitis and tibial tendonitis; bilateral carpal tunnel syndrome; and a sleep disorder.  However, after reviewing all of the evidence presented, the ALJ determined that prior to the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 15).  The ALJ found that prior to the date last insured Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could not climb, kneel, crouch or crawl and could only occasionally balance and stoop.  She could further only occasionally handle and finger bilaterally. She had to avoid concentrated exposure to hazards including no driving as part of work.

(Tr. 16).  With the help of a vocational expert, the ALJ determined that through the date last insured Plaintiff could perform work as a credit card callout operator and a surveillance system monitor.  (Tr. 24, 326-329).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff denied that request on August 15,

2018. (Tr. 1-5).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 21, 22).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

**II.    Evidence Presented**:

At the time of the administrative hearing held before the ALJ on November 22, 2016, Plaintiff was forty-four of age and had obtained a high school education, as well as, some college credit. (Tr. 61). The record reflects Plaintiff's past relevant work consists of work as an operations manager, a store marketing manager and a retail store general manager.  (Tr. 89-90, 246).

Prior to the relevant time period Plaintiff sought treatment for various impairments including but not limited to chronic low back pain, migraines, plantar fasciitis, bilateral knee surgeries and hand pain.

The pertinent medical evidence for the time period in question reflects the following. On October 5, 2010, Plaintiff was seen  by Dr. Thomas W. Atkinson for a medication refill check. (Tr. 550).  Dr. Atkinson noted that Plaintiff had lost her job which was tragic as Plaintiff was highly functioning.  Plaintiff reported that she was going to legally fight her firing. Plaintiff's left knee was noted as worse than her right knee.  Plaintiff also had lower back pain and was getting migraines.  Plaintiff reported some pain relief with her medication.

In a letter dated November 10, 2010, Dr. Kenneth R. Trinidad stated that he examined Plaintiff on May 10, 2010.  (Tr. 401-404).  Dr. Trinidad noted Plaintiff complained of constant pain in her knees that worsened with weight bearing or walking across a room.  Dr. Trinidad

3

noted that an evaluation of Plaintiff's extremities revealed tenderness over the medial and anterior aspects of her knees to palpation bilaterally. There was crepitance in the knees with movement. Range of motion testing of Plaintiff's knees revealed extension zero degrees and flexion one hundred twenty-five degrees, bilaterally. Dr. Trinidad noted the remainder of the examination was non-contributory. Dr. Trinidad opined that Plaintiff had not achieved maximal medical recovery and required further treatment and evaluation. Dr. Trinidad opined that Plaintiff was not temporarily totally disabled, as long as, sedentary work was available.

On December 7, 2010, Plaintiff complained of bilateral knee pain. (Tr. 408-410). Dr. Christopher A. Browne noted Plaintiff was being seen for an independent medical examination. Plaintiff complained of significant bilateral knee pain. After examining Plaintiff and objective studies, Dr. Browne assessed Plaintiff with bilateral patellar chondromalacia. Dr. Browne noted that Plaintiff's problem could be difficult to treat and he recommended Plaintiff seek a second opinion with someone with experience with cartilage transplant of the patella. Dr. Browne opined that Plaintiff could do sedentary work that did not require kneeling.

On February 11, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 549). Dr. Atkinson noted Plaintiff had gained a lot of weight. Plaintiff complained of congestion. Plaintiff reported seventy to eighty percent pain relief with her medication. Plaintiff was noted to have edema in her right leg and was to elevate her leg during the day.

On April 7, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 548). Dr. Atkinson noted Plaintiff was anxious about an upcoming hearing as her old employer would be present. Plaintiff reported she had taken Xanax before when she was stressed and requested this medication.

On June 15, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 515). Plaintiff reported knee, back and hand pain. Plaintiff reported sixty percent pain relief with her medications.

On June 28, 2011, Plaintiff was seen by Dr. David E. Nonweiler for her bilateral knee pain. (Tr. 636-639). Plaintiff reported her condition was work related. Plaintiff noted her symptoms worsened with standing, driving, squatting, kneeling, sitting, bending, climbing stairs, twisting, walking and moving from sitting to standing. Plaintiff reported improvement of her symptoms with narcotic medication. Plaintiff was assessed with bilateral knee patellafemoral pain and bilateral knee arthritis. Dr. Nonweiler opined that further medical treatment would not improve her symptoms. Dr. Nonweiler did not think a cartilage type procedure would be successful. Dr. Nonweiler recommended permanent light duty restrictions.

On August 17, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 514). Dr. Atkinson suggested Plaintiff move around in a pool for exercise. Plaintiff was noted to have a decreased range of motion of her right ankle. Plaintiff reported seventy percent pain relief with her medication. Dr. Atkinson discussed a rheumatology consult with Plaintiff.

On September 22, 2011, Plaintiff underwent x-rays of both feet that revealed no acute fracture or malalignment and no significant degenerative change. (Tr.458-459). X-rays of Plaintiff's hands revealed no evidence of degenerative change, bilaterally.

On October 17, 2011, Plaintiff was seen by Dr. Kevin M. Dukes. (Tr. 425-426). Plaintiff complained of bilateral knee pain. Upon examination, Dr. Dukes noted Plaintiff had pain over the patellofemoral joint. Plaintiff exhibited good range of motion and had a positive compression over the patellofemoral joint. Dr. Dukes noted he reviewed x-rays that looked

remarkably good.  Dr. Dukes noted Plaintiff was having a considerable amount of discomfort and was fairly emotional because of her knees.  Dr. Dukes recommended MRIs of both knees so that treatment could be determined.

On October 19, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 513).  Plaintiff reported her pain was about the same in her knees and back.  Plaintiff also reported difficulty sleeping.

In a letter dated November 14, 2011, Dr. Dukes indicated he was going to take Plaintiff off work until he was able to completely define and evaluate the pathology of her knee.  (Tr. 424).  Dr. Dukes indicated that from his one evaluation of Plaintiff he thought Plaintiff would be unable to return to work in any type of capacity that required prolonged walking and standing.  Dr. Dukes opined Plaintiff would be particularly limited with kneeling and squatting activities.  Dr. Dukes opined Plaintiff was temporarily totally disabled until her problem could be fully evaluated.

On December 16, 2011, Plaintiff was seen by Dr. Atkinson for a medication refill check.  (Tr. 512).  Plaintiff reported she was not feeling better or worse.

On January 3, 2012, Plaintiff was seen by Dr. R. David Cannon upon the referral of Dr. Atkinson.  (Tr. 413, 629).  Plaintiff complained of lower back pain, bilateral knee pain and foot and ankle pain.  Upon examination, Plaintiff was noted to have an antalgic gait.

On February 1, 2012, Plaintiff was seen by Dr. John Munneke for re-evaluation of injuries to her left and right knees.  (Tr. 416-418).  Plaintiff complained of persistent pain in both knees that she rated at a 5-7 on the pain scale with pain as high as 8 at times.  Upon examination, Dr. Munneke noted Plaintiff had a normal gait and station.  Examination of both the left and right knees revealed no evidence of swelling or effusion.  Plaintiff had post patellar

pain to ballottement bilaterally.  Plaintiff's strength was good and equal bilaterally but strength testing produced increased pain.  Dr. Munneke opined Plaintiff was in need of ongoing medical care and was temporarily totally disabled.  Dr. Munneke further opined Plaintiff was capable of returning to the workforce at a sedentary capacity.

On February 22, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 511).  Plaintiff reported pain in her heels and toes but was sleeping okay.  Plaintiff indicated seventy percent  pain relief with medication.

On March 2, 2012, Plaintiff underwent a MRI of the left knee that revealed nonspecific small joint effusion/mild synovitis; chondromalacia of the lateral tibial plateau and patella; no meniscal or ligament tear; and mild inflammatory change within the suprapatellar fat-pad.  (Tr. 427-430).  A MRI of the right knee revealed patellar chondromalacia; borderline joint effusion; and no meniscal or ligament tear.

On March 26, 2012, Plaintiff was seen by Dr. Dukes for a follow-up for her knee pain. (Tr. 422-423).  Plaintiff reported continued pain, even with simple daily activities like walking. Plaintiff reported experiencing difficulty with climbing-type activities, the left being slightly worse than the right.  Dr. Dukes noted both knees were unremarkable on examination other than that Plaintiff had pain of right patellofemoral portion of the knee. There was no significant swelling, crepitation or instability.  Dr. Dukes opined there was nothing surgical to be done that would be helpful.  Dr. Dukes offered Plaintiff cortisone injections which she declined.  Dr. Dukes noted Plaintiff was going to try to find work that did not require kneeling, squatting or prolonged standing.  Dr. Dukes indicated he would see Plaintiff as needed.

On April 30, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 510).  Plaintiff reported she had been out of her medication for at least three days and that

she had been ill.  Plaintiff was worried she had the flu.  Plaintiff reported sixty to seventy percent pain relief with medication.

In a letter dated May 4, 2012, Plaintiff was examined by Dr. M. Stephen Wilson in regard to the injuries sustained to her bilateral legs/knees as a result of her work related duties. (Tr. 468-472).  Dr. Wilson noted he evaluated Plaintiff in his clinic on November 11, 2011, and recommended further evaluation and treatment of her lower extremities.  Dr. Wilson noted Plaintiff experienced persistent pain and weakness in her bilateral knees.  Dr. Wilson noted Plaintiff's symptoms were aggravated with physical activity involving walking or standing for even brief periods.  Dr. Wilson opined Plaintiff would need continued care in the form of pain management.

On May 24, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 509).  Dr. Atkinson noted Plaintiff had been seen by Dr. Bonner for an x-ray of her right foot after stepping in a hole.  Plaintiff was to see Dr. Pleimann.  Plaintiff's medications were adjusted.

On June 12, 2012, Plaintiff was seen by Dr. Steven Moon for a new patient evaluation. (Tr. 571-581).  Plaintiff reported that for the past two months her right foot had been tender to touch.  Dr. Moon noted Plaintiff's report that she had aggravated her foot when she stepped into a hole.  Plaintiff denied paresthesias or weakness in her legs but reported low back pain without radicular symptoms.  Plaintiff reported quite a bit of tenderness when she got up in the morning.   Upon examination, Dr. Moon noted Plaintiff exhibited normal muscle strength and tone in the upper and lower extremities.  Dr. Moon noted no atrophy or abnormal movements and a normal gait and station.  Plaintiff reported pain to touch of the dorsum lateral right foot and over the heel.  Dr. Moon opined Plaintiff might have plantar fasciitis and a Morton's

neuroma.  Dr. Moon opined it would be reasonable to refer Plaintiff to pain management to see if localized injections helped.  Dr. Moon also thought a night foot splint might be beneficial.

On June 27, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 508).  Plaintiff reported sixty percent pain relief with her medications.

On July 27, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check.  (Tr. 507).  Plaintiff's medications were adjusted.

On August 6, 2012, Plaintiff was seen by Dr. Lloyd Trichell for pain in her heels.  (Tr. 434-435).  Plaintiff reported the pain was becoming progressively more severe and was most severe when first weight bearing or ambulating for long periods.  After examining Plaintiff, Dr. Trichell assessed her with plantar fasciitis, both feet; anterior and posterior tibial tendonitis; and pain in limb.  Dr. Trichell noted low dye L&M padding was applied to both feet.  There was also a discussion about using orthotics.  Plaintiff was to return in one week.

On August 13, 2012, Plaintiff returned to Dr. Trichell for a follow-up regarding her bilateral plantar fasciitis.  (Tr. 436-437).  Dr. Trichell noted Plaintiff had been treated with padding and that Plaintiff reported her pain was better.  After examining Plaintiff, Dr. Trichell noted the improvement and recommended Plaintiff use orthotics.

On August 20, 2012, Plaintiff returned to Dr. Trichell for follow-up evaluation regarding her plantar fasciitis.  (Tr. 438-439).  Plaintiff reported her pain was not much improved since the last office visit.  Plaintiff reported that she actually thought the problem was worse.  Plaintiff was fitted for custom orthotics and instructed to continue with treatment until her orthotics arrived.

On August 22, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 506). Plaintiff reported having bladder issues and that she had been drinking cranberry juice.

On September 14, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 505). Plaintiff was distressed with her weight gain.

On September 20, 2012, Plaintiff returned to Dr. Trichell for increased problems in her lower extremities. (Tr. 440). Dr. Trichell noted he fitted Plaintiff with her orthoses. Dr. Trichell noted Plaintiff had a satisfactory gait with her shoes and orthoses. Plaintiff was to follow-up in one year or in two weeks if she was not wearing her orthoses for eight hours per day.

On October 15, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 504). Plaintiff reported she passed a kidney stone and due to that took more medication.

On November 15, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 503). Plaintiff reported having had a bad month. Plaintiff reported problems with her feet because of bad orthotics. Plaintiff wanted to restart medication to help her lose weight as she had gained weight.

On December 11, 2012, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 502). Plaintiff reported she was doing well. Plaintiff reported she had been doing a lot of Christmas activity with her family.

On December 27, 2012, Plaintiff was seen by Dr. Atkinson with complaints of feet and leg swelling. (Tr. 501). A notation in Dr. Atkinson's notes dated January 7, 2013, indicated Plaintiff was out of pain medication four days early. (Tr. 501). Plaintiff requested medication as her insurance would not allow the mediation to be filled early.

On February 27, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 500). Plaintiff reported she was generally doing well. Plaintiff reported some swelling in her ankles at times. Plaintiff reported sixty percent pain relief with her medication.

On March 6, 2013, Plaintiff underwent a 2D echocardiogram and doppler study that revealed a normal echocardiogram demonstrating normal chamber sizes; preserved left ventricular systolic function; and whiff of mitral and tricuspid regurgitation, hemodynamically insignificant. (Tr. 456-457).

On March 28, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 499). Dr. Atkinson noted Plaintiff was not losing weight. Plaintiff reported she was barely getting things done daily.

On April 22, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 498). Plaintiff reported a lot of pain in her back and legs, as well as, cramping in her calves.

On June 17, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 497). Plaintiff reported she was feeling bad and that her feet hurt a lot. Plaintiff reported she ran out of her medication the previous day. Plaintiff reported she ran out of pain meds because she was helping her daughter move to Fort Smith for two months.

On June 19, 2013, Plaintiff entered the emergency room with complaints of swelling of her lower extremities, bilaterally. (Tr. 444-455). An ultrasound of Plaintiff's lower extremities was negative for evidence of deep venous thrombosis. Plaintiff was assessed with leg pain and a migraine headache.

On August 14, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 496). Plaintiff reported she had tripped and sustained a high ankle sprain.

11

In a letter dated September 25, 2013, Dr. Wilson stated the letter was a supplement to his report dated May 4, 2012. (Tr. 466-467). Dr. Wilson stated it was brought to his attention that Plaintiff was unable to perform her prior work related duties due to the permanent anatomical abnormalities and loss of function resulting from her work related injury. Dr. Wilson opined that Plaintiff would be an excellent candidate for vocational rehabilitation to help train her in a job consistent with her physical limitations and help her find employment with permanent restrictions of no kneeling, climbing, squatting or stooping.

On October 8, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 495). Dr. Atkinson noted Plaintiff was losing weight.

On December 3, 2013, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 494). Dr. Atkinson noted Plaintiff was losing weight and that her edema had been much better. Plaintiff reported a lot of stress with holiday activity. Plaintiff reported her knees were still an issue.

On January 29, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 485). Plaintiff reported seventy percent pain relief with her medications.

On March 24, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 484). Plaintiff reported she was doing "ok."

On May 20, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 483). Plaintiff complained of a lot of right knee pain since her last visit.

On July 14, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 482). Plaintiff complained of a lot of pain in her back and her knees. Dr. Atkins assessed Plaintiff with back and knee pain and refilled her medication.

12

On September 3, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 481). Plaintiff complained of a lot of pain in her lower back. Plaintiff reported she had been very busy.

On November 4, 2014, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 480). Plaintiff reported that recently she had been unable to sleep. Plaintiff's medication was adjusted.

On January 5, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (479). Dr. Atkinson noted Plaintiff had gained weight over the holidays. Plaintiff reported that she was trying to cut out sweets. Plaintiff reported it was hard to exercise due to pain.

In a letter dated January 14, 2015, Dr. Wilson stated he examined Plaintiff in regard to cumulative injuries that she sustained to her bilateral legs/knees as a result of her work related duties. (Tr. 461-465). Dr. Wilson recited the medical evidence he reviewed. After examining Plaintiff, Dr. Wilson opined Plaintiff sustained a change in condition for the worse since her adjudication on February 5, 2013, due to increased weakness, pain and instability in both of her knees. Dr. Wilson opined that Plaintiff was temporarily totally disabled and had been temporarily totally disabled since January 14, 2015, and would remain totally disabled for an undetermined amount of time pending further medical evaluation and treatment. Dr. Wilson recommended Plaintiff be referred back to a board-certified orthopedic specialist for further evaluation.

On February 26, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 478). Plaintiff reported sixty percent pain relief with her medication.

On April 20, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 477). Plaintiff reported sixty percent pain relief with her medications.

On June 15, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (476). Plaintiff reported seventy percent pain relief with her medications.

On August 10, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 475). Plaintiff reported some numbness in her hands and feet at times. Plaintiff reported seventy percent pain relief with her medications.

On September 8, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 474). Plaintiff reported some edema over the previous weekend. Plaintiff reported seventy percent pain relief with her medications.

On October 27, 2015, Plaintiff was seen by Dr. Atkinson for a medication refill check. (Tr. 544). Plaintiff reported recurrent episodes of edema in her lower legs and ankles. Plaintiff reported seventy percent pain relief with her medications.

The following medical records are dated after Plaintiff's insured status expired. On January 25, 2016, Dr. Christal Janssen, a non-examining medical consultant, completed a Psychiatric Review Technique form opining that for the time period in question Plaintiff had mild restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation, each of an extended duration. (Tr. 108). Dr. Janssen opined Plaintiff did not have a severe mental impairment prior to her date last insured. (Tr. 108-109). On, April 25, 2016, after reviewing the record, Dr. Nick Rios affirmed Dr. Janssen's opinion. (Tr. 128-129).

On January 25, 2016, Dr. Ronald Crow, a non-examining medical consultant, completed a RFC assessment opining that prior to her date last insured, Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-

hour workday; could push or pull unlimited, other than as shown for lift and/or carry; could frequently balance and stoop; could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, kneel, crouch and crawl; and that manipulative, visual and environmental limitations were not evident. (Tr. 110-112). On April 22, 2016, after reviewing the records, Dr. Lucy Sauer affirmed Dr. Crow's opinion. (Tr. 109-112).

On October 13, 2016, Dr. Atkinson completed a medical source statement opining Plaintiff could perform less than sedentary work. (Tr. 642-647).

On December 12, 2016, Plaintiff underwent a consultative neurological examination performed by Dr. Ahmad Al-Khatib. (Tr. 658-667). After examining Plaintiff, Dr. Al-Khatib assessed Plaintiff with bilateral carpal tunnel syndromes, mild to moderate on the right and mild on the left; and chronic low back pain. Dr. Al-Khatib opined Plaintiff had mild to moderate limitations in standing, walking, carrying and handling objects.

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th

Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §404.1520.

**IV.    Discussion:**

Plaintiff argues the following issue on appeal: 1) the ALJ erred in determining Plaintiff's severe impairments; 2) the ALJ erred in determining Plaintiff's RFC; and 3) the ALJ erred in his Step 5 analysis.

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2015. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of September 14, 2010, her alleged onset date of disability, through December 31, 2015, the last date she was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).

**B.    Plaintiff's Impairments:**

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing

she suffers from a medically-severe impairment at Step Two.   See Mittlestedt v. Apfel, 204

F.3d 847, 852 (8th Cir.2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe

impairments, the ALJ specifically discussed the alleged impairments in the decision, and

clearly stated that he considered all of Plaintiff's impairments, including the impairments that

were found to be non-severe.  See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir.2006)

(where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC

based on all alleged impairments, any error in failing to identify particular impairment as

"severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March

5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a

claimant's] medically determinable impairments ..., including ... impairments that are not

'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's]

impairments without regard to whether any such impairment, if considered separately, would

be of sufficient severity"). The Court finds the ALJ did not commit reversible error in setting

forth Plaintiff's severe impairments during the relevant time period.

### C.    Subjective Complaints and Symptom Evaluation:

We now address the ALJ's assessment of Plaintiff's subjective complaints.  The ALJ

was required to consider all the evidence relating to Plaintiff's subjective complaints including

evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the

duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4)

dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See

Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a

claimant's subjective complaints solely because the medical evidence fails to support them, an

ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record revealed that during the relevant time period, Plaintiff was able to take care of her personal needs; help take care of her daughter; prepare simple meals; shop for items while her husband shopped for groceries; watch television; read; and watch her daughter at school and sport activities.

With respect to Plaintiff's alleged impairments, the record revealed that Plaintiff responded to treatment and medication. Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.")(citations omitted).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she was unable to engage in any gainful activity during the time period in question.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible during the time period in question.

**D.    The ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes

19

medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In the present case, the ALJ considered the medical assessments of examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and her medical records when he determined Plaintiff could perform sedentary work with limitations. The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that ALJ improperly discounted the opinion of Dr. Atkinson who opined Plaintiff could perform less than sedentary. After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Dr. Atkinson's assessments were

inconsistent with his treatment notes, as well as the record as a whole.  Perkins v. Astrue, 648 F.3d 892, 899 (8th Cir. 2011) (it is permissible for ALJ to discount opinion that is inconsistent with physician's own treatment notes).  The Court notes that more than one examining specialist opined that Plaintiff would be able to perform sedentary type work during the time period in question.   After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### E.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a credit card callout operator and a surveillance system monitor during the time period in question. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal**

21

**questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of October 2019.

/s/ *Erin L. Wiedemann*

HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE